**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ANITA S. GILLIAM,**

       **Plaintiff,**

                                **Civil Action 2:17-cv-0441**
                                **Chief Magistrate Judge Elizabeth P. Deavers**

    **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## OPINION AND ORDER

Plaintiff, Anita S. Gilliam, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). This matter is before the Court for disposition based upon the parties' full consent to the Jurisdiction of the Magistrate Judge (ECF Nos. 10, 11), and for consideration of Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 19), Plaintiff's Reply (ECF No. 24), and the administrative record (ECF No. 9). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her application for benefits in May 2013, alleging that she has been disabled since February 26, 2013, due to depression, congestive heart failure, bulging disc, degenerative disc disease, diabetes, diabetic neuropathy, fibromyalgia, and arthritis. (R. at 262-68, 289.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Jeffrey Hartranft ("ALJ") held a hearing on November 10, 2015, at which Plaintiff, represented by counsel, appeared and testified, along with Lynne M. Kaufman, a vocational expert. (R. at 128-62.) On February 25, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 105-21.) On April 7, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony[1]

Plaintiff appeared at the administrative hearing in a wheel chair and stated that she had been using the chair for over two months and had been non-weight bearing due to three stress fractures and two neuromas (growth of nerve tissue). (R. at 133.) At the time of the hearing Plaintiff was forty-five years old. (R. at 135.) Plaintiff lives with her husband in a one-story house but her mother stays with her when her husband is at work so her mother can help her. (R. at 137.) She has a driver's license but has not driven "for about a year" prior to the hearing due to the boot on her foot. (R. at 138.)

Plaintiff testified that she last worked in February 2013 as a customer service representative. According to Plaintiff, she stopped working after she suffered an episode of congestive heart failure. (R. at 139.) She testified that even when she did work, she had trouble sitting and had to constantly move between sitting and standing. (*Id.*)

---

[1]The Court limits its analysis of the hearing testimony and medical evidence to the issues raised in Plaintiff's Statement of Errors.

Plaintiff testified that she is unable to work because she requires constant help with all activities of daily living even when she is weight bearing due to back pain and weakness in her upper extremities. (R. at 140-42.) Plaintiff also testified that she requires constant help and is unable to dress or bathe herself. (R. at 140.) Plaintiff further testified that her legs go numb after sitting for five minutes or walking a few feet and that her hands "get stuck" causing her to drop things and have difficulty writing and using utensils. (R. at 146-47.)

Plaintiff testified that she is bi-polar, elaborating that she would be "explosive or go from one day you want to live to the next day you want to die." (R. at 144.) She also testified that her mental health worsened over the last two years during which time she made multiple suicide attempts. (R. at 144-145.)

During a typical day, Plaintiff testified that she used to let her dogs out, but no longer can because she cannot go down her steps. (R. at 145.) She also testified that she washes dishes once a week, watches television, and reads books but with concentration issues. (*Id*.) Plaintiff further testified that she can only stand for a few minutes before needing to sit down, and that her legs go numb when she sits. (R. at 145-146.)

Plaintiff testified that she can no longer crochet or sew, cook, and cannot hold a pen well or type. (R. at 147-148.) She also testified that her low back pain travels down her legs but said she cannot distinguish radiating back pain from her diabetes mellitus neuropathy. (R. at 149.) Plaintiff described her diabetes mellitus foot ulcers as "very painful" and said she is going to have foot surgery to remove the neuromas in her feet after her boot is removed. (R. at 149-150.) Plaintiff further testified that she does not sleep much because she is kept awake by thoughts about her poor health. (R. at 150.) She stated that the only time she leaves home is to

see her doctors.   (R. at 151.)

### B.   Vocational Expert Testimony

The vocational expert (the "VE") testified at the administrative hearing that Plaintiff has past relevant employment as a customer service representative, classified as a sedentary exertion, skilled job.   (R. at 154.)   Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could not perform Plaintiff's past work but could perform 145,000 sedentary jobs in the national economy such as an assembler, inspector, marker, or finisher.   (R. at 157.)

The VE also testified that if the hypothetical individual was off task 10% of the workday, it would preclude competitive employment.   (R. at 158.)   The VE further testified that if the individual had two unexcused absences per month, she would not be able to maintain competitive employment.   (*Id.*)

## III.     MEDICAL RECORDS

### A. Physical Impairments

#### 1.   Primary care physician Parminder B. Singh, M.D.

The record contains treatment notes from Dr. Singh beginning January 22, 2010, when Plaintiff was seen for a checkup.   (R. at 730-31.)   During the relevant time period, Plaintiff saw Dr. Singh on April 29, 2013, complaining of right-foot pain and toe swelling for the preceding seven days and ongoing chronic lumbar pain.   (R. at 658.)   On examination, Dr. Singh found redness and swelling but specifically noted no lesions.   (R. at 659.)   Dr. Singh diagnosed right foot cellulitis and prescribed an antibiotic.   (*Id.*)

On October 9, 2013, Dr. Singh reported normal findings upon examination. (R. at 612.) On December 19, 2014, Dr. Sing again reported normal findings. (R. at 1066.) On January 3, 2014, Plaintiff saw Dr. Singh, who found no ulcers and reported normal findings. (R. at 599.) On January 20, 2014, Dr. Singh again found no ulcers and reported normal findings. (R. at 1077.) On March 26, 2014, Dr. Singh found no ulcers and reported normal findings. (R. at 1136-1137.)

Plaintiff continued to treat with Dr. Singh until at least November 2015. (R. at 596-789, 1038-1171, 1484-1556.) On March 19, 2015, Dr. Singh reported normal findings. (R. at 1040,) Between September and November 2015, Dr. Singh reported normal findings and found no ulcers on at least six occasions. (R. at 1487-1488, 1496-1497, 1503-1504, 1511, 1518.)

Objective tests ordered by Dr. Singh during his course of treatment included bilateral hip x-rays taken on March 30, 2013, which were normal and a lumbar MRI taken on April 2, 2013, which showed mild degenerative changes with a c-shaped curvature of the lumbar spine with main convexity to the left side; a central soft protrusion at L5-S1 with a leftward orientation contributing to abutment of the descending left S1 nerve. (R. at 733, 406-407.) The interpreting physician found no nerve root compression but noted mild symmetric degenerative arthrosis involving the sacroiliac joints. (R. at 406-07.)

## 2. Podiatrist Timothy Brown, D.P.M.

Plaintiff was referred to Dr. Brown by Dr. Singh in July 2013 for a diabetic ulcer on the bottom of her right first toe that reportedly had been present since April 2013. (R. at 475.) During the initial consultation, Dr. Brown noted that Plaintiff already owned diabetic shoes but did not wear them because "she does not like the looks of them." (R. at 477.) Dr. Brown

5

debrided the ulcer and prescribed an orthowedge for Plaintiff to wear.   (*Id.*)   When seen for follow-up on July 15, 2013, Dr. Brown noted that Plaintiff had been on her right foot "a lot," even though she states she just goes to the bathroom.   (R. at 455.)   Nevertheless, Dr. Brown observed that Plaintiff's diabetic ulcer had improved.   (*Id.*)

On August 23, 2013, Plaintiff received new diabetic shoes and immediately expressed an interest in discarding them for regular shoes.   (R. at 795-796.)   On August 26, 2013, Dr. Brown noted that she had not been wearing the new diabetic shows, but was wearing an old pair and also bought a pair of non-diabetic shoes.   (R. at 799.)   On the same day, Dr. Brown diagnosed a Grade 2 Wagner ulceration on Plaintiff's left first toe.   (*Id.*)   On August 29, 2013, Dr. Brown reported that the ulcer was "healing well."   (R. at 806.)   On September 3, 2013, Plaintiff returned with a diabetic ulcer on her right first toe, although the ulcer on her left foot had completely healed.   (R. at 809.)   By September 5, 2013, the ulcer on Plaintiff's right toe had shrunk from 10 mm to 8 mm, and by September 9, 2013, it was 3 mm in diameter.   (R. at 813, 817.)

By October 7, 2013, the right first toe ulcer had healed completely, but one week later it ulcerated again.   (R. at 842, 845.)   A culture of the ulceration revealed heavy growth of staph aureas and Dr. Brown noted a "new problem," paronchia medial margin right hallux toenail, which required surgical intervention.   (R. at 849-50.)   The ulceration of the right first toe healed by the end of October 2013, (R. at 868, 875.)   Dr. Brown noted on November 18, 2013, that Plaintiff's was in full compliance with her prescribed treatment and "actually doing very well." (R. at 883.)   In December 2013, Dr. Brown reported a new diabetic ulcer on Plaintiff's right first toe, but it healed by December 19, 2013.   (R. at 891, 901.)

In January 2014, a new ulcer appeared on Plaintiff's right first toe. (907.) In response to the recurring ulcer, Plaintiff underwent an MRI of her right foot in January 2014, which showed mild osteoarthritic changes. (R. at 1037.) Dr. Brown surgically corrected the bunion deformity in March 2014, and the right first toe ulcer healed by April 7, 2014. (R. at 1210.) Subsequent follow-up visits in May, July and September 2014 found Plaintiff free of any diabetic foot ulcers. (R. at 1179, 1187, 1191, 1202.) Dr. Brown noted Plaintiff's waxing and waning neuropathy, which he opined was the primary source of her remaining foot pain after the ulcer healed. (R. at 875, 897, 922, 969, 972.)

### 3. Podiatrist Jane Graebner, D.P.M.

Dr. Brown referred Plaintiff to Dr. Graebner in February 2014. (R. at 1421.) Dr. Graebner continued to treat Plaintiff through September 2015, related to her left foot. (R. at 1421-83.) At her initial appointment, Dr. Graebner found Plaintiff had 5/5 strength in her lower extremities bilaterally with symmetric range of motion and grossly intact sensation. (R. at 1422.) He also found an ulcerated callus on Plaintiff's right first toe. (*Id*.)

On April 13, 2015, Dr. Graebner again found lower extremity strength of 5/5 bilaterally but with limited range of motion. (R. at 1425.) Dr. Graebner also noted that Plaintiff's diabetic ulcers on her right first toe had completely healed. (*Id*.) On April 20, 2015, Dr. Graebner found bilateral lower extremity strength of 5/5 with limited range of motion and grossly intanct sensation. (R. at 1428.) On May 6, 2015, Dr. Graebner again found 5/5 bilateral lower extremity strength and limited range of motion, as well as grossly intact sensation. (R. at 1430.)

Dr. Graebner diagnosed Plaintiff with neuropathy and a neuroma in her left foot, treating her with a series of injections and high-frequency electronic wave therapy beginning in May

2015.  (R. at 1432-58.)   On May 20, 2015, Dr. Graebner found intact motor strength in Plaintiff's lower extremities and normal sensation to monofilament.  (R. at 1435.)   On May 27, 2015, Dr. Graebner again found intact lower extremity motor strength and normal sensation to monofilament.  (R. at 1438.)

On June 3, 2015, Dr. Graebner once more observed intact lower extremity motor strength and grossly intact sensation to light touch.  (R. at 1441.)   On June 10, 2015, Dr. Graebner found grossly intact sensation.  (R. at 1445.)   On June 17, 2015, Dr. Graebner found intact lower extremity motor strength, grossly intact sensation, and normal sensation to monofilament.  (R. at 1449.)   On June 22, 2015, Dr. Graebner found intact lower extremity motor strength, grossly intact sensation, and normal sensation to monofilament.  (R. at 1454.)

By July 2015, Plaintiff reported that the electrode treatment had helped her neuropathy symptoms significantly, though she still had some pain.  (R. at 1440-1441, 1456, 1460.)   On July 1, 2015, Plaintiff remarked that her right first toe "looks and feels better than it ever has." (R. at 1456.)   The same day, Dr. Graebner observed intact lower extremity motor strength, grossly intact sensation, and normal sensation to monofilament.  (R. at 1457.)      When seen on July 8, 2015, Plaintiff reported not being sure if she has poison ivy when evaluated for foot pain and rash.  (R. at 1460.)   Plaintiff stated that walking was "tolerable" with a short leg cast brace and cane for balance.  (*Id.*)   Dr. Graebner found intact lower extremity motor strength, grossly intact sensation, and normal sensation to monofilament.  (R. at 1460-1461.)   On July 13, 20 and 27, 2015 Dr. Graebner three times more found intact lower extremity strength, grossly intact sensation, and normal sensation to monofilament.  (R. at 1463-14-68.)   On July 29, 2015, Plaintiff underwent left-foot and left-ankle MRIs which showed some bone and joint

abnormalities and a small neuroma but showed no evidence of any stress fracture. (R. at 1480, 1483.)

On August 4 and 10, 2015 Dr. Graebner again found intact lower extremity strength, grossly intact sensation, and normal sensation to monofilament. (R. at 1469-1472.) On August 25, 2015, Dr. Graebner found grossly intact sensation with lack of protective sensation of the feet. (R. at 1476.) On September 5, 2015, Dr. Graebner for grossly intact sensation. (R. at 1478.)

### 4. Neurosurgeon Christian Bonasso, M.D.

Plaintiff consulted with Dr. Bonasso in April 2013 due to "pain from her neck to her coccygeal region." On examination, he found stooped, antalgic gait but normal leg strength. (R. at 404.) A thoracic spine MRI ordered by Dr. Bonasso was "essentially negative" with congenital appearing wedge deformity at T7 and mile levoscoliosis. (R. at 403.) A cervical spine MRI, ordered by Dr. Bonasso showed a shallow central disc displacement at C5-6 without central canal stenosis or cord compression, otherwise unremarkable. (R. at 402.) An electromyogram and nerve conduction study performed in May 2013 showed mild polyneuropathy in the legs. (R. at 401.) Dr. Bonasso concluded that no surgical intervention was necessary and recommended pain management. (R. at 400.)

### 5. Neurological spine surgeon Ying H. Chen, D.O.

Plaintiff consulted with Dr. Chen on May 31, 2013, for a second opinion regarding her low back situation. (R. at 413-15.) On examination, Dr. Chen found distal pulses diminished throughout, bilateral atrophic changes, cellulitis on right foot and diabetic ulcer on right toe, significant amount of lumbosacral guarding secondary to diffuse pain, associated back pain and

hamstring tightness with straight-leg raise bilaterally, deep tendon reflexes diffusely diminished in patellar and Achilles tendons bilaterally and antalgic gait. Dr. Chen agreed with Dr. Bonasso that no surgical intervention was necessary. He believed her "chronic diffuse pain syndrome" is rheumatological in nature and recommended a consultation. (*Id.*)

### 6. Endocrinologist Sirisha Donepudi, M.D.

Plaintiff consulted with endocrinologist, Dr. Donepudi in February 2013 for type 2 diabetes follow-up. He noted Plaintiff was originally diagnosed in the late 1980s and had not attended a follow-up appointment since December 2011. (R. at 360.) Dr. Donepudi increased her medication and instructed her on dietary changes and exercise. (R. at 360-63.) Dr. Donepudi completed a questionnaire on behalf of the state in January 2014 in which he stated she has not seen Plaintiff since the February 2013 appointment and that Plaintiff was non-compliant in following prescribed treatment and had skipped appointments. (R. at 791-92.)

### 7. Endocrinologist Constantine Kroustos, M.D.

Plaintiff saw Dr. Kroustos on June 1, 2014. Dr. Kroustos noted that Plaintiff had missed all of her insulin doses the previous day and subsequently had high sugars. (R. at 1120.) Otherwise, Dr. Kroustos noted normal examination results. (R. at 1121.) On at least four other occasions, Dr. Kroustos noted similarly normal examination results. (R. at 1131, 1389, 1392, 1395.)

### 8. Rheumatologist Catherine Lee, M.D.

In July 2013, Plaintiff consulted with Dr. Lee for musculoskeletal complaints. (R. at 503-508.) Dr. Lee assessed fibromyalgia upon finding 14/18 positive tender points during examination. (R. at 507.) Upon examination in August 2013, Dr. Lee found marked thoracic

and lumbar paraspinal tenderness, bilateral hand deformities, and 12/18 fibromyalgia tender points, but no edema. (R. at 500.) Dr. Lee reported on October 2013, that Plaintiff weighed 281 pounds, with a BMI of 39.80. (R. at 493.) Dr. Lee measured her RAPID3[2] at 22.7, which "suggests high severity." (*Id.*) Dr. Lee diagnosed fibromyalgia, osteoarthrosis, dry mouth/eyes, fatigue, congestive heart failure, and peripheral neuropathy. (R. at 494.) The record shows Plaintiff continued to treat with Dr. Lee through March 2015 and that she was non-compliant with at least some treatment, such as medication, diet, and exercise, on several occasions. (R. at 989, 1001, 1003, 1007, 1011-1012.)

### 9. State agency review

William Bolz, M.D., reviewed Plaintiff's medical record in November 2013 and determined Plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk about six hours in an eight-hour workday; and, sit about six hours in an eight-hour workday. (R. at 174.) He further opined that Plaintiff could occasionally climb ramps and stairs but never climb ladders, ropes, and scaffolds. (R. at 175.) Dr. Bolz also determined that Plaintiff could not work around unprotected heights, hazardous machinery due to pain, antalgic gait and obesity. (R. at 176.) Plaintiff was found to be partially credible noting "[t]he objective medical evidence does not support her claims nor is the use of a cane reported to be obligatory." (R. at 174.)

---

[2] RAPID3 (routine assessment of patient index data 3) is a pooled index of the 3 patient-reported American College of Rheumatology rheumatoid arthritis (RA) Core Data Set measures: function, pain, and patient global estimate of status. Each of the 3 individual measures is scored 0 to 10, for a total of 30. Disease severity may be classified on the basis of RAPID3 scores: >12 = high; 6.1-12 = moderate; 3.1-6 = low; < or =3 = remission. *See* https://www.ncbi.nlm.nih.gov/pubmed/19962621.

Leigh Thomas, M.D. reviewed Plaintiff's medical record upon reconsideration in March 2014 and found Plaintiff was limited to four hours of standing and/or walking and only occasional pushing/pulling with the bilateral lower extremities. (R. at 195.) Dr. Thomas also determined that Plaintiff is limited to occasional climbing of ramps/stairs, kneeling, crouching or crawling; and frequent balancing. (*Id.*) Dr. Thomas also determined that overhead reaching was limited to occasionally bilaterally due to central canal stenosis at C5-6 from central disc displacement. (R. at 196.)

### 10. Medical expert Ronald Kendrick, M.D.

After reviewing Plaintiff's medical file, Dr. Kendrick completed interrogatories on November 30, 2015, in which he opined that Plaintiff's impairments neither met nor medically equaled any listing, particularly Listings 1.04 and 11.04. (R. at 1416-1417.) He noted that there was no evidence of motor loss or ineffective ambulation. (R. at 1417.) Dr. Kendrick opined that Plaintiff has the capacity to perform sedentary work and had no restrictions regarding her arms but was limited to occasional bending, stooping, kneeling, crawling, or climbing of ramps or stairs, no climbing of ladders, ropes, or scaffolds, and the need to avoid operating foot controls bilaterally. (R. at 1418.)

### B. Mental Impairments

### 1. Consultative examinations

T. Rodney Swearingen, Ph.D. examined Plaintiff for disability purposes on August 14, 2013. (R. at 416-20.) Dr. Swearingen found Plaintiff exhibited direct speech, well-organized thought process, and unremarkable behavior. (R. at 418.) Dr. Swearingen found Plaintiff to be alert, fully oriented, and cooperative and noted that she exhibited average short-term memory,

fair remote memory, above-average immediate recall, average abstract reasoning, and good word knowledge, social judgment, concentration, and persistence. (R. at 418-20.) Dr. Swearingen diagnosed depressive disorder NOS and anxiety disorder NOS; he assigned a Global Assessment of Functioning score ("GAF") of 57. (R. at 419.) Dr. Swearingen opined that Plaintiff would have some limitations in getting along with coworkers and supervisors in a work setting after she reported being suspicious of others and not socializing out of her home with others. (R. at 420.) He recommended a low stress work environment due to Plaintiff's reports of dealing with stress by crying and eating and her poor coping skills. (*Id.*)

Plaintiff was again evaluated for disability purposes by Donald McIntire, Ph.D. in April 2014. (R. at 978-87.) Dr. McIntire diagnosed Plaintiff with major depressive disorder, post-traumatic stress disorder, generalized anxiety disorder, social anxiety disorder, agoraphobia, and obsessive-compulsive disorder. (R. at 986.) Dr. McIntire found her capable of simple work. (*Id.*) Dr. McIntire noted Plaintiff performed poorly on simple repetitive tasks but performed well on more complicated tasks and found her unimpaired in her ability to get along with coworkers. (*Id.*) Plaintiff reported that she never had problems dealing with coworkers and that she has been able to maintain long-term relationships. (*Id.*) Dr. McIntire reported that she interacted well with him. (*Id.*) Dr. McIntire opined that Plaintiff's ability to handle workplace stress is "more limited" than in the past due to her reports of responding to minor problems with catastrophic thinking that leads to panic attacks and avoiding stress to cope. (*Id.*)

### 2. Psychiatrist Bipin Desai, M.D.

When Plaintiff was evaluated by Dr. Desai on May 22, 2014, she reported feeling depressed and anxious. (R. at 1334.) On mental status examination, Dr. Desai found "signs of

severe depression," and specifically found sad demeanor and speech and thinking "slowed by depressed mood." (R. at 1334.) He also found Plaintiff was friendly, fully communicative and she exhibited logical thought process, normal cognitive functioning, fair insight and judgment, and no signs of hallucinations, delusions, or other psychotic process. (R. at 1334-35.) He diagnosed severe major depressive disorder and generalized anxiety disorder and prescribed an antidepressant and continued her anxiety medication. (R. at 1335.)

The record shows Plaintiff continued to treat with Dr. Desai for medication management through at least August 12, 2015. (R. at 1308-33.) Clinical records show Plaintiff consistently reported improvement, saying she felt "pretty good" or "better." (R. at 1308, 1310, 1314, 1316, 1318, 1321, 1324, 1326, 1328, 1330, 1332.) Mental status examinations revealed Plaintiff to be friendly and fully communicative, with either "fair" or "improved" mood and affect; speech that was coherent, spontaneous, and normal in rate, volume, and tone; logical thought processes; intact associations; appropriate thought content; and fair insight and judgment. (R. at 1308-1335.)

On April 7, 2015, Dr. Desai opined that Plaintiff was "very unstable from a psychiatric standpoint and highly explosive. Even with aggressive treatment, she continues to be unstable." (R. at 1173.) He concluded that she was permanently and totally disabled. (*Id*.)

### 3. State Agency Evaluation

State agency psychologist, Robyn Hoffman, Ph.D. reviewed the file in August 2013 and found that Plaintiff had moderate restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence and pace. (R. at 173.) Dr. Hoffman found Plaintiff's statements partially credible.

14

(R. at 174.)   Dr. Hoffman opined that Plaintiff is limited to occasional interaction with

co-workers; only infrequent and easily-explained changes; no strict production quotas; and, no

'over-the-shoulder' supervision."   (R. 176-77.)   State agency psychologist, Kristen Haskins,

Psy.D., reviewed the file at the reconsideration level in April 2014 and found that Plaintiff had

mild restrictions in her activities of daily living; moderate difficulties in maintaining social

functioning; and moderate difficulties in maintaining concentration, persistence and pace.   (R. at

192.)   Dr. Haskins opined that Plaintiff can "perform simple to moderately complex routine

tasks."   (R. at 197.)

## IV.   THE ADMINISTRATIVE DECISION

On February 22, 2016, the ALJ issued his decision.   (R. at 105-21.)   The ALJ found that

Plaintiff meets the insured status requirements of the Social Security Act through December 31,

2018.   (R. at 107.)   At step one of the sequential evaluation process,[3] the ALJ found that

Plaintiff had not engaged in substantially gainful activity since February 26, 2013, the alleged

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.   *See* 20 C.F.R. §416.920(a)(4).   Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

onset date. (*Id.*) The ALJ found that Plaintiff has the severe impairments of diabetes with neuropathy; obesity; lumbar degenerative disc disease; cervical degenerative disc disease; thoracic degenerative disc disease; fibromyalgia; arthritis right foot; degenerative arthrosis sacroiliac joints; depressive disorder; anxiety disorder; post-traumatic stress disorder; social anxiety disorder; agoraphobia; obsessive compulsive bipolar disorder. (*Id.*) The ALJ also found that the record reflects the following nonsevere medically determinable impairments: history of chronic heart failure; coronary artery disease; peripheral artery disease; hypertension; hyperlipidemia; gastritis; migraines; sleep apnea; gastroesophageal reflux disease; onychogryphosis cryptosis; hypothyroidism; history of carpal tunnel syndrome; history of left knee surgery; stress reactions of the left foot, and neuromas. (*Id.*) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 109.) At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that claimant can stand and walk for fifteen minutes at a time and for a total of two hours over the course of the workday; needs a cane for standing and walking but can lift and carry up to the sedentary exertional limit in the other hand. Furthermore, the claimant can operate occasional foot controls; can occasionally climb ramps and stairs but not ladders, ropes, or scaffolds; can perform frequent balancing; occasional stooping, kneeling, crouching and crawling; occasional overhead reaching; she should avoid workplace hazards such as unprotected heights and dangerous machinery; she cannot perform commercial driving. Finally, the claimant is capable of simple, routine and repetitive tasks involving only simple, work-related decisions and with few, if any, workplace changes in a setting with no strict production quotas or fast-paced work such as on an assembly line and which requires only occasional interaction with supervisors, coworkers, or the general public.

(R. at 111.)   The ALJ accorded "little weight" to the opinions of treating physician, Dr. Singh, and treating podiatrist, Dr. Brown.   (R. at 114-115.)   The ALJ accorded "partial weight" to the medical expert opinion of Dr. Kendrick, and "some weight" to the opinions of the State Agency non-examining reviewing physicians.   (R. at 115-116.)

In formulating his mental RFC, ALJ Hartranft afforded "great weight" to the state agency non-examining psychological consultants.   (R. at 117.)   He gave "little weight" to Dr. Desai's opinions, "less weight" to Dr. Swearingen's findings, and "some weight" to Dr. McIntire's assessment.   (R. at 116.)   The ALJ also noted that "[t]he record reflects serious compliance issues with the claimant's treatment.   There is also evidence of improvement in the claimant's symptoms with treatment."   (R. at 115.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform her past relevant work, other jobs exist in the national economy that Plaintiff can perform.   (R. at 119-20.)   He therefore concluded that Plaintiff is not disabled under the Social Security Act.   (R. at 120.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").   Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

17

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ erred by not finding her diabetic ulcers to be a severe impairment and finding that her ulcers did not meet or equal Listing 8.04. (ECF No. 14 at 6-8.) Plaintiff also contends that the ALJ erred by failing to obtain a proper medical expert by not obtaining a medical opinion from a podiatrist. (*Id.* at pp. 8-9.) In addition, Plaintiff argues the ALJ erred in his evaluation of treating psychiatrist. Dr. Desai. (*Id.*

at 9).   Finally, Plaintiff argues that the ALJ's credibility finding is not supported by substantial evidence.   (*Id.* at 10-11.)

## A.   Listing 8.04 Chronic Infections of the Skin

In her first assignment of error, Plaintiff asserts that the ALJ erred in finding that Plaintiff's diabetic ulcers did not cause a severe impairment or meet or equal Listing 8.04, Chronic Infections of the Skin.   (ECF No. 14 at 6.)

As an initial matter, the Court finds that the ALJ did not commit reversible error by failing to find Plaintiff's diabetic ulcers cause a severe impairment.   Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003).   Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."   20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).   Here, the ALJ found numerous severe impairments, including diabetes with neuropathy.   (R. at 107.)   Plaintiff does not argue that the ALJ failed to consider the limiting effect of her diabetic ulcers in determining her RFC, and the Court notes that the ALJ thoroughly considered Plaintiff's diabetic ulcers at various points in his opinion.   (R. at

109, 112, 114-115.)   Plaintiff's only recourse in this situation is to challenge the supportability of the ALJ's RFC determination by substantial evidence, which she does not do.

Turning to the ALJ's analysis at step three, the Commissioner has provided a "Listing of Impairments" which describes certain impairments that are considered disabling.   20 C.F.R. §§ 404.1525(a), 416.925(a); *see*, Pt. 404, Subpt. P, App'x 1 (Listing of Impairments).   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and that impairment meets or equals a listed impairment located at 20 C.F.R. Pt. 404, Subpt. P, App'x 1, then the claimant is presumed disabled.   *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 804 (6th Cir. 2008) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).   Because satisfying the listings during the third step yields an automatic determination of disability based on medical findings, rather than a judgment based on all relevant factors for an individual claimant, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five-step evaluation.   20 C.F.R. §§ 416.925(d), 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing.   *Id.*, 493 U.S. at 530.

"The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'"   *Id.*, 493 U.S. at 532–33 (citing 20 C.F.R. § 416.925(a) (1989)).   The listings "streamlin[e] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they

would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). "Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively." *Irland v. Commir of Soc. Sec.*, No. 11-14787, 2013 WL 823286, at *11 (E.D. Mich. Feb. 11, 2013), *report and recommendation adopted,* No. 11-14787, 2013 WL 822377 (E.D. Mich. Mar. 5, 2013) (quoting *Caviness v. Apfel*, 4 F. Supp. 2d 813, 818 (S.D. Ind.1998)).

Listing 8.04 requires "[c]hronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 8.04. The regulations define "extensive skin lesions":

> 1. Extensive skin lesions. Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:
>
>> a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.
>>
>> b. Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.
>>
>> c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

*Id.* § 8.00(C)(1)(a)-(c).

Plaintiff argues that her diabetic ulcers affected her continuously from April 2013 through April 2014, including periods of persistence lasting more than three months. (ECF No. 6-7.) Plaintiff also argues that her condition satisfies the severity requirement of Listing 8.04 due to the presence of multiple ulcers that affect her ability to function and cause significant

pain.  (*Id*. at 7.)   Defendant counters that Plaintiff's condition does not meet the Listing's

requirements because it is not sufficiently extensive.   (ECF No. 19 at 10-11.)   Specifically,

Defendant argues that the regulations require "skin lesions on the soles of *both feet* . . . that very

seriously limit [one's] ability to ambulate."   (*Id*. at 10 (quoting 20 C.F.R. Pt. 404, Subpt. P,

App'x 1, § 8.00(C)(1)(c).)   Defendant also argues that Plaintiff's ulcers did not persist "despite

continuing treatment as prescribed" because Plaintiff was noncompliant with her prescribed

treatment.   (*Id*. at 11 (quoting 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 8.04.)

Plaintiff first developed an ulcer on her right first toe sometime before July 1, 2013.   (R.

at 424, 432, 434, 438, 443.)   The ulcer healed sometime between August 15 and 23, 2013.   (R.

at 424 (ulcer measured 1 x 2 mm on August 15), 794.)   By August 26, 2018, however,

Plaintiff's left first toe had developed a grade 2 Wagner ulceration.   (R. at 799.)   By September

3, 2013, this ulcer had also healed, but the ulcer on Plaintiff's right toe reoccurred on August 31,

2013.   (R. at 806-807, 809.)   The record contains no evidence that she developed another

ulceration on her left toe and shows that she was completely ulcer-free during follow-up visits in

May, July and September 2014.   (R. at 1179, 1187, 1191, 1202.)   Defendant is correct, then,

that Plaintiff did not have ulcers simultaneously on both feet for the requisite three-month

period, as required by the regulations.   Nor did Plaintiff provide evidence that her condition

persisted for at least three months despite continuing treatment as prescribed.   If anything, the

record presents evidence that suggests Plaintiff exacerbated her condition by her chronic failure

to follow prescribed treatment, as noted by the ALJ.   (R. at 109, 112, 115.)

On August 26, 2018, only a few days after receiving new diabetic shoes and inserts,

Plaintiff returned to Dr. Brown with a newly ulcerated left toe after wearing an older pear of

diabetic shoes and a pair of non-diabetic shoes. (R. at 799.) This was just one of many instances when Dr. Brown or his staff observed Plaintiff's failure to follow her prescribed treatment. (R. at 455, 477, 794-796, 821.) The ALJ also noted that Plaintiff's endocrinologist deemed her "noncompliant" with her general diabetes treatment regime, highlighting Plaintiff's continuing failure to make recommended dietary changes or begin exercising. (R. at 112-113, 357, 360, 791-792.)

The Court finds therefore that substantial evidence supports the ALJ's finding that Plaintiff's diabetic ulcers do not meet the requirements of Listing 8.04. Accordingly, Plaintiff's first contention of error is without merit.

## B. Failure to Obtain an Expert Medical Opinion

In her second assignment of error, Plaintiff argues that the ALJ erred by failing to obtain an expert medical opinion. (ECF No. 14 at 8.) Specifically, Plaintiff avers that the ALJ's analysis at step three was fatally flawed because he did not seek an expert medical opinion from a podiatrist in determining whether Plaintiff's condition met the requirements of Listing 8.04. (*Id*. at 8-9.) As explained above, however, Plaintiff failed to provide evidence that her diabetic ulcers persisted for at least three months despite continuing treatment as prescribed by her doctors. Although an expert medical opinion might be helpful in evaluating the severity of Plaintiff's ulcer-caused impairments, it would not provide evidence of compliance with prescribed treatment. In any event, the ALJ is not required to obtain a medical expert because that determination, except under very limited circumstances that do not exist here, is discretionary. *See* 20 C.F.R. § 404.1513a(b)(2) ("Administrative law judges *may* also ask for medical evidence from expert medical sources." (emphasis added)); *Ferguson v. Comm'r of Soc.*

*Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) ("The ALJ has discretion to determine whether additional evidence is necessary.").

Any failure to seek an expert medical opinion then is, at most, harmless error because substantial evidence still supports the ALJ's ultimate finding at step three. *Rabbers*, 582 F.3d at 651. Accordingly, Plaintiff's second assignment of error is without merit.

## C. Dr. Desai's Treating Source Opinion

In her third assignment of error, Plaintiff argues that the ALJ erred by not giving controlling weight to Dr. Desai's treating source opinion evidence in formulating Plaintiff's mental RFC. (ECF No. 14 at 9.) Specifically, Plaintiff maintains that the ALJ should have adopted Dr. Desai's opinion that Plaintiff is "unstable and highly explosive even with aggressive treatment." (*Id.*)

In evaluating a claimant's case, the ALJ must consider all medical opinions that she receives. 20 C.F.R. § 416.927(c). Medical opinions include any "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the

24

treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In her assignment of error, Plaintiff does not indicate how she believes the ALJ erred in evaluating Dr. Desai's opinion evidence. Plaintiff does not argue that the ALJ misapplied the *Wilson* factors or failed to give good reasons for discounting Dr. Desai's opinion. Instead, Plaintiff merely lists reasons why she believes Dr. Desai's opinion should be given more weight. (ECF No. 14 at 9.) The ALJ's findings, however, are not reversable merely because Plaintiff can point to substantial evidence in the record to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). The ALJ retains a "zone of choice" within which to act, and if he [or she] does not stray beyond its borders, the Court will not interfere. *Id.* If the ALJ's decision is supported by substantial evidence, it must be affirmed, even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Sec. of Health and Human Servs.*, 658 F.2d 437, 439 (6th Cir. 1981). Moreover, a review of the record reveals that the ALJ's decision to accord Dr. Desai's opinion little weight is supported by substantial evidence.

The ALJ noted "many mild to normal mental status exam findings" by both treating and examining sources.   (R. at 114.)   The ALJ also noted that Plaintiff's condition improved with treatment and that she was frequently noncompliant and had gaps in her mental health treatment. (R. at 116-118.)   The ALJ further noted that Plaintiff regularly reported improved symptoms. (R. at 117.)   Consequently, the ALJ found that Dr. Desai's opinion evidence conflicted with his own treatment notes and other substantial evidence in the record.   (*Id*.)   The ALJ's reasoning is well-supported by the factual record.

In August 2013, Dr. Swearingen found Plaintiff to have a well-organized thought process and unremarkable behavior, as well as good social judgment.   (R. at 418-420.)   Dr. McIntire reported that Plaintiff interacted well with him and that she reported no impairment in her ability to get along with coworkers.   (R. at 986.)   Further, Dr. Desai himself found Plaintiff friendly, with fair insight judgment, and logical thought processes, and no signs of hallucinations, delusions, or other psychotic process on multiple occasions.   (R. at 1308-1335.)   During her appointments, Plaintiff consistently reported improvement while under Dr. Desai's care, saying she felt "pretty good" or "better."   (R. at 1308, 1310, 1314, 1316, 1318, 1321, 1324, 1326, 1328, 1330, 1332.)

The Court finds therefore that the ALJ properly applied the *Wilson* factors in giving good reasons for according Dr. Desai's opinion evidence little weight and that substantial evidence supports his finding.   Accordingly, Plaintiff's third assignment of error is without merit.

## D.  Plaintiff's Credibility

In her fourth contention of error, Plaintiff argues that the ALJ erred in finding her "not entirely credibly."   (ECF No. 14 at 10.)   Specifically, Plaintiff challenges the ALJ's credibility

findings with respect to her testimony regarding her inability to be left alone; her necessity to alternate between sitting and standing on one foot; her inability to climb stairs; her problems using her hands; and, her need for assistance with all activities of daily living.  (*Id.*)

"The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record."  *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters*, 127 F.3d at 531.

Plaintiff argues that her testimony is supported by objective medical evidence in the record.  (ECF No. 14 at 11.)  In particular, Plaintiff points to the May 2013 EMG that revealed

polyneuropathy in both legs, (R. at 400-412), the August 2013 finding of bilateral hand deformities and 12/18 fibromyalgia tender points (R. at 486-512), persistent foot ulcers and infections (R. at 939-977, 978-987, 1419-1483), and her mood instability.

The ALJ noted in his opinion that most of Plaintiff's examination findings were "mild to normal" and "do not support the very severe limitations alleged." (R. at 113, 114.) A review of the factual record supports the ALJ's conclusion. Dr. Graebner found intact leg strength and grossly intact sensation, as well as normal sensation to monofilament and no edema at most examinations. (R. at 1425, 1428, 1430, 1435, 1438, 1441, 1445, 1449, 1457, 1460-1461, 1463, 1465, 1467-1470, 1472.) Dr. Chen found no signs of instability and "general intact strength in the lower extremities with only very mild generalized weakness with dorsiflexion and plantarflexion." (R. at 414.) Dr. Singh, Plaintiff's primary care physician, reported normal findings on numerous occasions. (R. at 599, 612, 618, 622, 641, 661, 1040, 1066, 1077, 1136-1137, 1511, 1518). As explained above, Plaintiff's mental examination findings were largely mild to normal. Moreover, substantial evidence in the record supports the finding that Plaintiff's diabetic-ulcer condition is controllable and the severity and regularity of outbreaks are largely attributable to her noncompliance with prescribed treatment. As with Plaintiff's other assignments of error, the presence of some substantial evidence in support of her preferred outcome is insufficient to overturn the ALJ's findings, which are themselves supported by substantial evidence. *Buxton*, 246 F.3d at 772-773.

The Court finds therefore that substantial evidence supports the ALJ's credibility finding with respect to Plaintiff's subjective testimony. Accordingly, Plaintiff's fourth assignment of error is without merit.

## VII.    DISPOSITION

For the reasons stated above, the Court concludes that substantial evidence supports the

ALJ's decision denying benefits.    Accordingly, the Court **OVERRULES** Plaintiff's Statement

of Errors and **AFFIRMS** the Commissioner's decision.    The Clerk is **DIRECTED** to enter

judgment in favor of Defendant.

**IT IS SO ORDERED.**


Date: August 28, 2018                                     _____/s/ *Elizabeth A. Preston Deavers*_____
                                                         ELIZABETH A. PRESTON DEAVERS
                                                         CHIEF UNITED STATES MAGISTRATE JUDGE